## No. 39.

### CLAVARIE & NOBLE *v.* EUGENE WAGGAMAN *et al.*

1. Sheriffs, under writs directing, in general terms, the seizure of a debtor's property, must, at their peril, primarily determine whether the property to be seized belongs to the defendant or not. .

2. Under writs commanding the seizure of specific property, the sheriffs, ordinarily, have no discretion and incur no responsibility, being held only to look to the jurisdiction of the court, and to the proper execution of its mandate.

3. Courts must presume that legislators are familiar with the principles of law applicable to questions they have under consideration, but this is not an absolute presumption.

4. Where it is reasonably possible, courts will adopt an interpretation which would give to a law a wise and equitable purpose and effect, rather than one which is unjust or absurd.

5. Nevertheless, the courts are bound, above all things, to seek for and enforce the legislative intent; and so long as this is within constitutional

limits, apparent injustice or absurdity is not a reason authorizing diso-
bedience to its mandates, or a refusal of enforcement.

6. The presumption that the Legislature had some purpose to be accom-
plished in all its enactments is conclusive, and courts are not at liberty
to adopt interpretations which are virtual repeals.

7. Meaning of the term, "mesne process," as found in the old common law.

8. Courts will take judicial cognizance of the meaning of the words and
terms forming part of the prevalent language of a country.

9. Opinion in E. Conery & Son vs. Eugene Waggaman affirmed, on rehear-
ing, in this case.

*Appeal from Sixth District Court. Rightor, Judge.*

*Bentinck Egan* for plaintiff.
*T. & J. Ellis* for defendant.

McGLOIN, J.—Concerning the facts in this case, as set out
in the petition, there is no dispute. The question of law in-
volved is, whether the civil sheriff of this parish was justified
in releasing from seizure the steamboat Seminole, which he had
taken under a writ of sequestration, basing his action upon
plaintiff's neglect to furnish bond of indemnity demanded under
section 3579 Revised Statutes. That section authorizes sheriffs
who have seized, or may be required to seize, personal prop-
erty, " by virtue of any mesne or final process, to demand,
when such property is claimed by a third person, a bond of
indemnity from the person or persons in whose interest the
process issued." By section 3581, he is authorized either to
release the seizure or refuse to seize, as the case may be, should
such bond not be furnished within twenty-four hours after
demand. Section 3581 provides for the assignment of such
bond to the claimant, relieving the sheriff from liability for
damages, unless the obligors of such bond be insolvent.

The responsibility of a sheriff towards parties whose prop-
erty he takes into his custody, is not the same under all writs.
In cases of *fieri facias* and ordinary attachment, the mandate
is, to seize the effects of defendant without specification, leav-
ing him to determine, primarily, the question of ownership,
which he must do at his peril. Levying upon that which does

not belong to the debtor is not a compliance with the mandate of the court, and he stands liable for damages. Freeman on Executions, § 254.

Where, however, as in cases of seizure and sale, sequestration and provisional seizure, the court directs the taking of particular property, no discretion whatever rests with the executive officer. He, therefore, incurs no responsibility by virtue of the levy, provided only he sees to the jurisdiction of the court and properly executes the writ. Went v. Morgan, 3 La. 313; Driggs v. Moran, 10 Rob. 124; Elmore v. Hufty, 13 La. An. 227; Hunter v. Bell, 14 La. An. 142; Rau v. Katz, 26 La. An. 464; State ex rel. v. Vaughn, 29 A. 707

Indeed, the dignity of judicial tribunals, and, in fact, their efficiency, depending upon the respect and obedience accorded their lawful mandates, disobedience thereto, or even hesitation in their execution, is not to be tolerated with safety.

If the property seized in such cases should not have been levied upon, the fault lies alone with the court, or with the parties who have wrongfully misled it. The law has rendered necessary, before the issuance of such writs, the production of certain evidence of an applicant's rights thereto; and in cases of sequestration, a bond is required in the interest of all persons to be affected by the order. Being bound, as we are, to presume that the legislators are familiar with the principles of law applicable to matters before them, we cannot imagine that the legislation in question was intended to apply to cases such as the one under consideration; and that it would impose the idle obligation of indemnifying a public officer against a peril to which he was not exposed. Nor is it supposable that it was intended in this manner, obscure and indirect, to provide a second bond in favor of possible claimants in addition to that exacted previous to the issuance of the writ. Such a supposition is hostile to the patent purpose of the law, and we are not to presume that legislation conceals or obscures its aims or endeavors to accomplish them by routes that are covert and circuitous.

Nevertheless, were we satisfied that the Legislature really had such motives, its will must be enforced if not respected. The reasoning suggested is merely employed with a view to establishing presumptions, which are to control if the legislative purpose be left in doubt. C. C. 18. The writ of sequestration is certainly not *final process;* and we must see if it be covered by the term "mesne process," which is evidently borrowed from the English law. *Mesne* is defined by Bouvier and Webster as signifying "intermediate, the middle, between two extremes, that part between the commencement and the end, as it relates to time," and "middle, intervening." Bouvier, amongst his illustrations, gives "mesne process as that which issued in a suit between the original and final process." His further definitions under headings "mesne process" and "process in practice," are substantially the same. The citations he employs support the position that the point of distinction between process, original and mesne, lies solely in the stage of the suit at which it issued. Blackstone, Book IV, p. 279; Stephen's Commentaries, vol. 1, pp. 102, 104; Finch's Law, pp. 237, 436.

If we endeavor to compare the course of litigation under our system to the more cumbersome one of the old common law, we might consider our citation as being equivalent to their *original process,* and all that intervened between citation and execution as *mesne process.* Adopting this view, we find by our Code of Practice, Art. 276 and its associates, that the writ of sequestration is usually demanded in the same petition with citation, and that the two may, and usually do, issue together. We find also by Art. 237, that the conservatory writs may issue before the citation, and even before the filing of the petition praying for the same. Under such circumstances, we can scarcely consider writs so issuing as being covered by the term *mesne,* or as being in any sense "intermediate." It is true, that such writs may issue at a later stage of the suit, but even then, they can be obtained only by supplemental or amended petition, accompanied by citation, and the essential

nature of the one writ can no more be affected by this possibility than the other.

But Blackstone and Bouvier and Webster, copying, declare also: "Mesne process is also sometimes put in contradistinction to final process or process of execution, and then it signifies all such process as intervenes between *the beginning* and end of a suit."

This clause, for a time, caused much wavering and uncertainty upon our part. Closer study, however, satisfied us that, at common law, the term *process* was not applied to the proceeding which inaugurated a suit, and was, therefore, most akin to our citation. Blackstone, Book IV, p. 272, defines this first step or action as the " original, or original writ." The same author, at page 279, says : The next step for carrying on the suit, after suing out the *original*, is called *the process*. It is then that he divides this process itself into original and mesne. So Finch, page 436, declares: " Judicial process is a process out of that court where the original is returned, prosecuting the action," etc. Further on we find : " Judicial process or mesne process, are in the nature of new originals.' The same author defines the *writ* as "a latin letter of the King's, from thence, in parchment, sealed with his seal," etc. Finch's Law, p. 237. So Tidds' Practice, vol. 1 p. 103, makes this declaration : " Original writs are calculated for the commencement or removal of actions," etc. We, therefore, cannot satisfy ourselves that what are known under our law as conservatory writs come, under any aspect of the question, under the definition of mesne process. We are fortified in this opinion by the conclusion that the conservatory writ of sequestration, as existing in our law, and having for its object the bringing into judicial custody of property, specially affected in favor of the claim sued upon, pending the suit, and not simply to compel defendants to appear or to execute judgments against them, was unknown to the common law. It was certainly not amongst the class of proceedings which went by the title of *mesne process.*

There is another consideration which satisfies us with the result of our investigations in this case. The writs of sequestration, provisional seizure and attachment, as defined by our Code of Practice, issue against property where a plaintiff has his right in, to or against the same, by reason of a privilege or the non-residence, fraud, etc., of the debtor. They constitute proceedings against the property generally cumulated with those against his person. Their object is usually, as already stated, to bring that property before the court, there to hold it pending the suit, and to abide its issue. While strictly speaking they are not actions *exclusively in rem*, as known to our law and defined in Arts. 290, 291, C. P.; yet ordinary suits, in which conservative writs issued have generally been considered by our courts as being in their nature proceedings both *in rem* and *in personam*. Such has been the intimation where writs of sequestration were concerned, in Block Brothers *v.* Bartha, 20 La. An. 344; Peterson *v.* Willard, 17 La. An. 96. In cases of attachment, the same intimation is found in Page *v.* Generes, 6 La. An. 549, Woodworth *v.* Lemmerman, 19 La. An. 524; Boughton *v.* King, 2 La. An. 569. In cases of provisional seizure we have Henning *v.* Steamer St. Helena, 5 La. An. 349; Holmes *v.* Cheiftain, 1 La. An. 136; Lalaurie *v.* Woods, 8 La. An. 366; McGunnigle *v.* Bowman, 14 La. 447.

It is, therefore, in accordance with our jurisprudence to consider the conservatory writs allowed in such cases to issue simultaneously with and even before the citation as being themselves in the nature of original process or writs directed against the property of defendant or in dispute, as the case may be, and intended to subject it to the jurisdiction of the court, either alone or in conjunction with the person of the debtor.

The plaintiffs have fully proven the amount of the loss resulting to them by the fault complained of as required by R. S. Sec. 3594.

For these reasons it is decreed that the judgment appealed from be reversed, and that plaintiffs, Clavarie & Noble, do now

Clavarie & Noble vs. Waggaman et al.

have judgment against defendant, Eugene Waggaman, late civil sheriff of this parish, as principal, in the full sum of four hundred and eighty-seven $\frac{94}{100}$ dollars ($487 94), with legal interest from April 27th, 1875, amount of the claim and judgment in the suit whence issued the writ in question, and for the further sum of forty-two dollars, costs of clerk and sheriff in said cause, and that defendants, S. H. Kennedy and Lafayette Folger, sureties upon the official bond of said sheriff, be severally condemned in the like amount, and that defendants pay all costs of this suit.

## ON REHEARING.

McGLOIN, J.—After a careful re-examination of the issues presented in this cause, we have not been led to recede from the later conclusions arrived at, and fully recited in the opinion rendered in the similar case of E. Conery & Son v. same defendants.

We recognize the absurdity of the legislative action in authorizing sheriffs to exact, before executing a writ, from which, if properly enforced, no liability to him can arise, a bond of indemnity. But, as we have already declared, if such were the legislative purpose, we have no right to obstruct or defeat it, for the question of policy or impolicy of legislation is not primarily one of a judicial nature.

We are fully disposed to avail ourselves of the judicial privileges—we may even say to respect the duty of selecting interpretations which indicate the wisdom of the legislator rather than those imputing to him ignorance or folly. This right or duty, however, can only intervene where there is room for the reasonable application of either interpretation. It cannot justify courts in imposing upon a statute a meaning hostile to its language or against its evident intent. The functions of courts are exclusively interpretative, and their first duty is to seek honestly and fairly for the legislative purpose, and without striving, by cunning devices in the applica-

tion of language, to defeat or restrict what they are convinced is the object of the law.

· The constitutions, State and National, lay down all the checks and restrictions to which legislation is subjected, and within the bounds prescribed by these instruments the Legislature has unlimited authority and the absolute power to be unwise or even arbitrary. Therefore, while the courts will not lightly attribute to it purposes which seem to them unwise, or even unjust, yet, if such a purpose be patent, the only restrictions judicial tribunals are at liberty to apply are those expressed or clearly implied by the constitutional law. If these be not applicable or sufficient, there may be a case of hardship or oppression, but the remedy lies not with the courts, which are compelled to apply the law as it is given to them.

Seeking, therefore, the legislative intent, we have been forced to the conclusion, that the General Assembly when enacting the law under consideration, employed the term "mesne process" in its generally accepted sense, that which prevails with Bench and Bar of the State. This undoubtedly held the term as applicable to the conservatory acts or writs defined in our Code of Practice.

Pending the final determination of this cause, the organ of the court, in the delivery of this opinion, took occasion to approach, without presenting or discussing the question at issue in this cause, occupants of the Bench and members of the Bar of this city for their impression as to the meaning or application of the term under consideration, and the unvariable answer was that it covered the conservatory writs defined in the Code. The meaning of words forming part of the prevalent language of a country is a matter of which courts must take judicial cognizance, just as they do of its history or geography, and the court is satisfied with the correctness of its conclusions as to the sense to be given to the words "mesne process."

Nor is there open to us any avenue by which to escape the absurdity commented upon. If we adopt the contracted definition of the old common law, as done in the first opinion in

this case, we strike out from the scope and operation of the statute every writ affecting property, not final in its nature, known to our legislation, and the law in question is left without force or effect whatever.

This we cannot do, because the presumption that the Legislature intended to accomplish some object in the enactment of every statute is conclusive, and the courts cannot accept an interpretation which is virtually a repeal.

Judgment affirmed, with costs in both courts.